**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| KEVIN SECKA, | CASE NO. 4:21-cv-01948 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | <u>**MEMORANDUM OPINION AND ORDER**</u> |
| Defendant. | |

Plaintiff Kevin Secka ("Plaintiff" or "Mr. Secka") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

application for Disability Insurance Benefits.  (ECF Doc. 1.)  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g) and is before the undersigned pursuant to the consent of the

parties.  (ECF Doc. 13.)  For the reasons set forth below, the Court **AFFIRMS** the

Commissioner's decision.

## I.    Procedural History

The application for Disability Insurance Benefits ("DIB") at issue in this case was filed

on August 23, 2012 and later consolidated with an application for DIB filed on June 16, 2016.[1]

(Tr. 739.)  Mr. Secka alleged a disability onset date of June 1, 2010 (Tr. 119, 255, 324) due to

disc degeneration, arthritis, nerve damage, depression, back injury, and high blood pressure (Tr.

119, 167, 177, 328, 739).  His application was denied initially, on reconsideration, after a hearing

---

[1] Mr. Secka filed earlier applications for social security benefits that were denied or withdrawn.  (Tr. 739.)

before an Administrative Law Judge ("ALJ"), and upon review by the Appeals Council.  (Tr. 739.)  Mr. Secka then filed an appeal with the United States District Court for the Northern District of Ohio, Case No. 4:16-cv-01556.  (*Id*.)  This Court reversed and remanded the decision on June 20, 2017, finding it was unable to assess whether the ALJ's January 14, 2015 decision was supported by substantial evidence without further explanation.  (*Id*.)  The Appeals Council vacated the January 2015 decision on October 23, 2017, and remanded the case for further proceedings.  (Tr. 739, 922.)  The Appeals Council found that the remand rendered Mr. Secka's June 2016 claim for benefits a duplicate of the August 2012 claim and ordered consolidation of the two files for issuance of a new decision on the consolidated claims.  (*Id*.)

After a hearing on June 11, 2018, a new ALJ issued an unfavorable decision on July 9, 2018, finding Mr. Secka not disabled.  (Tr. 949-72.)  The Appeals Council vacated the July 2018 decision on February 10, 2020, remanding the case for a new hearing and decision because: (1) the ALJ did not consolidate the records for the two claims as directed; and (2) the hypothetical given to the vocational expert was different from the residual functional capacity finding in the decision.  (Tr. 740, 973-77.)

A hearing before the same ALJ was held on June 15, 2020, pursuant to the February 2020 Appeals Council remand order.  (Tr. 770-810.)  The ALJ again issued an unfavorable decision on August 5, 2020, finding Mr. Secka had not been under a disability from June 1, 2010 through December 31, 2015.  (Tr. 736-68.)  Mr. Secka filed exceptions to the ALJ's decision with the Appeals Council.  (Tr. 1133-40.)  On September 13, 2021, the Appeals Council found no reason to assume jurisdiction, making the ALJ's August 5, 2020 decision the final decision of the Commissioner.  (Tr. 729-34.)  Mr. Secka then filed the pending appeal.  (ECF Doc. 1.)

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Mr. Secka was born in 1973.  (Tr. 255, 780.)  He graduated from high school, earned an associate degree in applied sciences for HVAC, and has a commercial driver's license.  (Tr. 329, 613, 781, 785.)  He has past relevant work as a tractor trailer truck driver, heating and air conditioner installer/servicer, refrigeration mechanic, and electrical appliance repairer.  (Tr. 783-88, 801-02.)

### B.    Medical Evidence

#### 1.    Relevant Treatment History

##### i.    Evidence Predating the Alleged Onset Date

Mr. Secka has a history of back pain dating back to at least 2005.  He underwent a bilateral L5-S1 lumbar microdiscectomy on November 22, 2005, performed by Parviz Baghai, M.D., a neurosurgeon with The Neurosurgery Group of Western Pennsylvania.  (Tr. 401-02, 409-10, 415-16, 425.)  He returned to work after that surgery.  (Tr. 423.)

Mr. Secka returned to Dr. Baghai on October 23, 2006, reporting he had been doing well until three weeks earlier, when he had experienced back pain after moving suddenly while in bed and again after carrying a furnace.  (Tr. 423.)  He also reported he had not been able to work after falling at work the week before.  (*Id.*)  Examination findings showed a positive straight leg raise at about 60 degrees bilaterally and some give-way weakness in both dorsiflexors.  (*Id.*)  Dr. Baghai diagnosed recurrent lumbar radiculopathy and ordered an EMG and lumbar spine MRI. (*Id.*)  An October 30, 2006 lumbar spine MRI showed findings compatible with postoperative scar of the epidural space at L5-S1, enhancement of the posterior aspect of the L5-S1 disc space, possibly related to postoperative change, and changes in the bone marrow signal at the anterior

half of the L5 vertebral body that could be inflammatory.  (Tr. 458, 480.)  There was old damage showing on an EMG Nerve Conduction study.  (Tr. 439.)

Mr. Secka saw treating physician Michael T. Guffey, M.D., on November 13, 2006 regarding his back pain.  (Tr. 458.)  On examination, he demonstrated tenderness in the lumbosacral spine, higher than his prior surgery and almost into the thoracic region.  (*Id*.)  He also exhibited difficulty with shoulder rotation and straight leg raise.  (*Id*.)  Dr. Guffey noted a possible recurrent herniated disc or back injury, but felt that was "a lot less likely" since the MRI was negative.  (*Id*.)  He prescribed a five-day course of Decadron, with Naprosyn twice a day thereafter.  (*Id*.)  He also prescribed Lunesta for sleep.  (*Id*.)

During an examination on December 1, 2006 with Dr. Guffey, Mr. Secka's back was "still very tender especially in the lower region and he [was] developing some pain in his bilateral knees and ankles."  (Tr. 457.)  Dr. Guffey noted that Mr. Secka's "job [was] quite physical and of course it [was] exacerbating his back pain."  (*Id*.)  Mr. Secka returned to neurosurgeon Dr. Baghai on December 18, 2006.  (Tr. 422.)  Following that visit, Dr. Baghai summarized Mr. Secka's condition in a letter to Dr. Guffey.  (*Id*.)  He reported Mr. Secka had tried two epidural steroid injections without improvement, was prescribed Mobic, Skelaxin, and Vicodin, and had received spinal decompression treatments through a chiropractor.  (Tr. 422.)  Dr. Baghai recommended a TENS unit and indicated that Mr. Secka had not tried Neurontin. (*Id*.)  He explained that there was no surgical problem he could treat.  (*Id*.)

Mr. Secka returned to Dr. Guffey on January 25, 2007, reporting that Vicodin was not helping and was upsetting his stomach.  (Tr. 456.)  He reported he was seeing a chiropractor. (*Id*.)  He was not interested in returning to the pain clinic because the epidural injections were not helping.  (*Id*.)  Dr. Guffey noted his last MRI was unremarkable, showing only scar tissue

from his earlier surgery; he recommended against chronic pain medications.  (*Id*.)  Mr. Secka reported he continued to aggravate his injuries at work.  (Tr. 455.)  Dr. Guffey advised him to be cautious at work and to take a couple of weeks off work if needed to allow his back to heal.  (*Id*.)  Mr. Secka's back was "still tender around the lumbar region" on examination with "a little bit exaggerated tenderness . . . even with very light pressure."  (*Id*.)  Dr. Guffey prescribed Mobic, Skelexin, Tramadol, and Neurontin, and recommended physical/occupational therapy.  (*Id*.)

Mr. Secka returned to Dr. Guffey on February 27, 2007, reporting that he felt his back pain was worse because he was experiencing numbness and burning pain radiating into his legs.  (Tr. 455.)  He reported that Mobic, Skelexin, Tramadol, and Neurontin had not helped too much.  (*Id*.)  Examination revealed pain to palpation of the spine.  (*Id*.)  Dr. Guffey continued to recommend physical therapy; he also recommended a repeat MRI, which was completed on March 5, 2007.  (Tr. 454-55, 472-73.)  The MRI showed: mild spinal canal narrowing with significant bilateral foraminal stenosis at L5-S1; mild loss of disc height at L5-S1 with mild discogenic degenerative endplate changes and anterior osteophytes; status post right hemilaminectomy at L5; and L2 vertebral body hemangioma.  (*Id*.)

Mr. Secka returned to Dr. Guffey on March 7, 2007 for follow up and to review the MRI results.  (Tr. 454.)  He continued to report back pain, sciatica, and pain and numbness through his legs in a pattern consistent with L5-S1 distribution, which was where the MRI showed moderate bilateral foraminal stenosis and mild spinal stenosis and where he had his prior microdiscectomy.  (*Id*.)  Dr. Guffey noted that Mr. Secka might require further surgery and referred him to Dr. Baghai for surgical evaluation.  (*Id*.)  Dr. Guffey prescribed Vicodin as needed for pain and advised Mr. Secka to continue taking Mobic and Skelexin as needed.  (*Id*.)

Mr. Secka also saw Michael R. Cozza, M.D., for pain management at Beaver Valley Rehabilitation Associates in 2007.  (Tr. 439-42.)  At his initial visit with Dr. Cozza in March 2007, Mr. Secka stood in a bent forward position, listing to the right; he was very tender in the lumbar paraspinal muscles, with tenseness but no spasms on palpation in his back bilaterally; he had difficulty walking on his heels, but could walk on his toes; his active range of motion in extension was to zero degrees; his forward flexion was to sixty degrees; his straight leg raise bilaterally was to eighty degrees in the sitting position; and he demonstrated no calf atrophies. (Tr. 440.)  Dr. Cozza prescribed Naprosyn, Kadian, and physical therapy with laser light, moist heat, and ultrasound.  (*Id*.)  Mr. Secka returned to Dr. Cozza the following month.  (Tr. 441.) He reported his medication had helped for about a week but physical therapy had not helped. (*Id*.) Dr. Cozza added Vistaril.  (*Id*.)

Mr. Secka filed applications for social security benefits in 2007.  (Tr. 44.)  He subsequently withdrew those claims in 2008 due to medical improvement.  (Tr. 44, 71, 159.)

### ii.      Evidence Postdating with the Alleged Onset Date

Mr. Secka experienced an injury at work on June 1, 2010 while lifting a bread machine, causing pain in his back and legs.  (Tr. 489, 574, 566.)   Mr. Secka saw Mark LoDico, M.D., on August 3, 2010 for an initial pain management visit at Advanced Pain Medicine.  (Tr. 489-492.) He reported pain across his entire low back with radiation into the lateral and posterior aspects of bilateral lower extremities, and numbness, tingling, and a burning sensation in the same areas. (Tr. 489.)  He reported weakness in his bilateral lower extremities but denied falling due to weakness.  (*Id*.)  He reported minimal to no pain relief with pain medications, a TENS unit, or physical therapy.  (*Id*.)  He reported he did not want to take any long-acting opiates and was only using ibuprofen occasionally.  (Tr. 489-90.)  Mr. Secka was able to sit and converse comfortably

with no demonstration of overt pain behaviors; he rose from a seated position with the assistance of his arms; his gait was nonantalgic; he walked with his lumbar spine slightly flexed forward due to pain; he was able to heel walk, toe walk, and squat with moderate difficulty secondary to pain; he had moderate tenderness to palpation in the midline and bilateral lumbar paraspinal muscles; he exhibited 5/5 muscle strength in bilateral hip flexion, knee flexion / extension, ankle dorsiflexion / plantar flexion; he had +1 patellar and Achilles reflexes on the left and +2 patellar and +1 Achilles reflexes on the right; he had decreased sensation to light touch in the lateral aspects of the right lower leg distal to the knee; he had decreased sensation to temperature in the lateral aspects of bilateral lower legs; his straight leg raise was positive on the right and negative on the left; and there were no palpable cords, muscle spasms or true trigger points. (Tr. 490.) He was diagnosed with lumbar spinal pain secondary to discogenic syndrome versus facet arthropathy, history of lumbar spine diskectomy in 2005, and lumbar extremity radicular syndrome. (*Id*.) Dr. LoDico noted that Mr. Secka had significant pain relief in the past after receiving lumbar epidural steroid injections. (*Id*.) Dr. LoDico's recommendations included lumbar epidural steroid injections, a lumbar spine MRI, and possible EMG nerve conduction studies of the bilateral lower extremities. (Tr. 491.)

Mr. Secka received lumbar epidural steroid injections on August 6 and August 20, 2010. (Tr. 493-98.) During a follow-up visit at Advance Pain Medicine on September 15, 2010, Mr. Secka reported that he was "nearly 100% improved" since his two injections; while he still had constant pain across his low back, he rated his average pain level at a one to two out of ten. (Tr. 499.) His examination revealed normal strength and Achilles reflexes, absent patellar reflexes, and negative straight leg raise bilaterally. (*Id*.) He declined further injections. (*Id*.) He was advised to call to schedule another injection if his symptoms increased. (*Id*.)

Two weeks later, on September 28, 2010, Mr. Secka reported that his lumbar spinal pain had increased significantly.  (Tr. 501.)  He reported pain across his entire low back with radiation to his bilateral hips, and occasionally to his lower extremities.  (*Id*.)  He denied numbness, tingling, or weakness in his lower extremities.  (*Id*.)  He requested pain medication.  (*Id*.)  During his examination, he rose from a seated position with the assistance of his arms but was able to sit comfortably with no demonstration of overt behaviors and his gait was non-antalgic.  (*Id*.)   Dr. LoDico prescribed hydrocodone, ordered EMG nerve conduction studies of the bilateral lower extremities, and referred Mr. Secka to a neurosurgeon for evaluation.  (*Id*.)

EMG nerve conduction studies on October 1, 2010 showed bilateral L4 and right L5 radiculopathy without new or active denervation, bilateral tibial motor mononeuropathy, and bilateral sural sensory mononeuropathy.  (Tr. 510, 560-62.)  Mr. Secka saw Richard S. Plowey, M.D., at Advanced Pain Medicine on October 7, 2010, reporting increased pain and that the hydrocodone did not help with his pain.  (Tr. 504.)  During his physical examination, he rose from a seated position with assistance from his arms; his gait was slow but non-antalgic; he was able to heel walk, toe walk, and squat, but with some reported discomfort; his bilateral lower extremity muscle strength was normal; his patellar reflexes were +2 and his Achilles reflexes were +1; and he had negative straight leg raise bilaterally.  (*Id*.)  Dr. Plowey prescribed Opana, Lyrica, and Mobic.  (Tr. 505.)

Mr. Secka returned to Advanced Pain Medicine on October 20, 2010 and saw Lloyd G. Lamperski, M.D.  (Tr. 507-08.)  He reported increased pain over the past five days that improved with "flexing forward."  (Tr. 507.)  He also reported some spasm in his low back.  (*Id*.)  On examination, Mr. Secka was uncomfortable but in no acute distress; he rose from a seated position slowly with the assistance of his arms and walked in a forward flexed position; his gait

8

was slow and antalgic but without favoring either extremity; he was tender over the bilateral lumbar paraspinal muscles, the right more than the left; he was tender over the lumbar area midline; there were no palpable cords or muscle spasms observed; muscle strength testing revealed 4/5 strength in the bilateral quadriceps secondary to pain and 5/5 strength in the balance of his bilateral lower extremities; straight leg raises were negative bilaterally. (*Id.*) Dr. Lamperski increased the Opana dose and provided Mr. Secka with a new Lyrica prescription; he had been unable to fill the prior prescription because no diagnosis was included with the initial prescription. (*Id.*) Mr. Secka was also prescribed a Medrol dose pack to be taken for exacerbation of pain and advised to continue taking Mobic. (*Id.*)

Mr. Secka returned to neurosurgeon Dr. Baghai on October 29, 2010 for an evaluation regarding possible surgical intervention. (Tr. 505, 566.) He reported that Lyrica was helping but he was still having significant pain, and that the Medrol dose pack had not helped. (Tr. 566.) His examination showed a positive straight leg raise at about sixty degrees, causing back and leg pain. (*Id.*) His neurological examination showed no focal deficit. (*Id.*) Dr. Baghai recommended that Mr. Secka continue with conservative treatment. (*Id.*) He stated that it was his belief that the majority of Mr. Secka's symptoms resulted from "stressor during the incident of June 1, 2010." (*Id.*)

Mr. Secka continued treatment at Advanced Pain Medicine in November and December 2010, and continued to report back pain. (Tr. 510-15.) He reported that his spasms had improved since taking the Medrol dose pack, Lyrica was helping his leg pain, and Voltaren gel was providing mild relief from his back pain. (Tr. 510, 513.) He reported no relief following increases in the Opana dosage; the dosage was increased again. (Tr. 510, 513-14.) He could not obtain a refill on his Mobic and was taking over-the-counter Aleve. (Tr. 510, 511.) He had

started physical therapy with some relief.  (Tr. 513.)  Dr. LoDico recommended lumbar facet nerve blocks, with the possibility of lumbar facet rhizotomy and a lumbar diskography in the future.  (Tr. 511, 514.)

On January 7, 2011, Mr. Secka had bilateral lumbar facet nerve blocks.  (Tr. 516-18.)  He then had a left lumbar facet rhizotomy on January 11, 2011.  (Tr. 519-22.)  He reported some relief following the procedures.  (Tr. 519, 523.)  He saw Dr. LoDico on January 17, 2011 and reported that he noticed less left lower extremity pain following the rhizotomy, but he had increased cramping and pressure on the left side and in his back.  (Tr. 523.)  He reported that he had discontinued Opana because it was not helping, even at the increased dosage.  (*Id*.)  He reported that Lyrica was helping his lower extremity pain, but he stopped taking it because it was causing forgetfulness.  (*Id*.)  He was able to sit comfortably with no overt pain behaviors during his examination.  (*Id*.)  On examination, he demonstrated tenderness to palpation of the lumbar paraspinal muscles.  (*Id*.)  His gait was antalgic and he favored his left lower extremity.  (*Id*.)  His patellar and Achilles reflexes were intact and there was no erythema or edema in the low back.  (*Id*.)  Dr. LoDico discontinued Opana and recommended that Mr. Secka restart Lyrica at a decreased dosage to help decrease the pressure sensation in his back.  (*Id*.)  Dr. LoDico also recommended a right lumbar facet rhizotomy.  (*Id*.)

Mr. Secka returned to Dr. LoDico a week later.  (Tr. 526.)  He reported that his pain had worsened.  (Tr. 526.)  Dr. LoDico prescribed MS Contin, continued Lyrica, suggested Tylenol, and recommended a right lumbar facet rhizotomy once Mr. Secka's pain settled.  (*Id*.)

Mr. Secka returned for a follow-up Advanced Pain Medicine visit with Dr. Lamperski on February 10, 2011.  (Tr. 529.)  He reported that his back pain was worse than his leg pain.  (*Id*.)  He reported that MS Contin was not working.  (*Id*.)  He was taking Lyrica and Aleve, but was

not taking Tylenol as suggested at his prior office visit.  (*Id*.)  He appeared uncomfortable at times during the examination, rose from a seated position slowly with the assistance of his arms, and his gait was slow but not antalgic.  (*Id*.)  Dr. Lamperski discontinued MS Contin in favor of Opana, continued Lyrica, and advised Mr. Secka to use Tylenol as needed.  (Tr. 529-30.)

On February 28, 2011, Mr. Secka had a right lumbar facet rhizotomy.  (Tr. 536.)  He saw Dr. Lamperski for follow up on March 10, 2011.  (*Id*.)  He reported a significant decrease in his lower extremity pain but was not sure whether it was attributed to the rhizotomy procedure or medication changes.  (*Id*.)  He continued to report pain across his back and dorsal aspect of his feet as well as intermittent mild numbness in the lateral thigh.  (*Id*.)  During the examination, he exhibited no overt pain behaviors, rose from a seated position with his arms, his gait was non-antalgic, and his bilateral lower extremity muscle strength was normal.  (*Id*.)

Mr. Secka continued pain management treatment at Advanced Pain Medicine through September 2011, receiving lumbar epidural steroid injections on June 21, August 2, and August 22, 2011.  (Tr. 539-59.)  When he returned to Advanced Pain Medicine on September 6, 2011, he reported that his first injection had helped for about a week but his low back pain returned after his left leg fell through the floor of his cabin.  (Tr. 548, 557.)  The latter two injections had helped with his lower extremity pain, but had not completely relieved his lower extremity pain and he still had back pain.  (Tr. 557.)  He said he had been evaluated by a worker's compensation doctor who felt he could return to full duty work.  (*Id*.)  During the examination, Mr. Secka exhibited no overt pain behaviors, but his gait was slightly antalgic, favoring the right lower extremity.  (*Id*.)  His lower extremity muscle strength was 4/5.  (*Id*.)  Dr. Plowey recommended a lumbar diskography.  (*Id*.)  Dr. Plowey also noted that:

> [Mr. Secka] last worked in HVACR which required significant lifting, bending, twisting and prolonged standing.  He is unlikely to return to that type of work at

11

this time and we will have him remain off of full duty at this time.  He is restricted to sit, stand and walk ad lib. with no lifting greater than 10 pounds.

(*Id*.)

Mr. Secka returned to neurosurgeon Dr. Baghai on October 10, 2011.  (Tr. 565.)  He reported that his symptoms had been increasing over the past year.  (*Id*.)  A straight leg raise test was positive on the left at about sixty degrees.  (*Id*.)  The remainder of his examination did not show any focal neurological deficit.  (*Id*.)  Dr. Baghai recommended a lumbar MRI and EMG and nerve conduction testing of both legs.  (*Id*.)

A lumbar MRI on October 12, 2011 showed no significant changes from the prior June 2010 MRI.  (Tr. 567.)  There continued to be mild diffuse disc bulge at L5-S1 but no significant central canal narrowing.  (*Id*.)  Mild bilateral neural foraminal and narrowing and lateral recess narrowing was unchanged.  (*Id*.)  EMG nerve conduction studies of the lower extremities were performed on October 17, 2011.  (Tr. 568-70, 600.)  The physical examination conducted as part of the EMG studies showed: hypoactive deep tendon reflexes; sensation appeared preserved to pinprick, light touch and vibration sense with some patchy alteration noted on both feet; pedal pulses were palpable; and no footdrop phenomenon was noted.  (Tr. 568, 600.)  The nerve conduction studies were abnormal, with the following findings:

Axonal impairment noted in the right tibial nerve, on the EMG studies diffuse chronic partial denervation changes were seen in multiple myotomes.

The abnormalities noted are most consistent with a chronic lumbosacral polyradiculopathy, no abnormalities suggestive of a recurrent acute lumbosacral radiculopathy was noted.

(Tr. 568, 600.)

Mr. Secka returned to Dr. Baghai on October 24, 2011.  (Tr. 564.)  He reported no right-sided symptoms, but that he continued to have left leg numbness that was sharp with associated

aching, stabbing, burning, and tingling.  (*Id*.)  He reported that his symptoms were worse with activity.  (*Id*.)  He also reported pain in the top of his foot and occasionally in his groin.  (*Id*.)  Dr. Baghai noted pain in the lower back on examination.  (*Id*.)  He reviewed the results of the MRI and EMG and nerve conduction study and recommended a spinal cord stimulator and further evaluation.  (*Id*.)

Mr. Secka left Advanced Pain Medicine due to a change in his insurance in 2011.  (Tr. 643.)  He started pain management treatment at Allied Pain Treatment Center, Inc. ("Allied") beginning in 2012 and continued treatment there through 2013.  (Tr. 587-95, 603-11, 623-42.)

Mr. Secka saw Dr. Thomas Ranieri, M.D., at Allied on April 17, 2012, reporting that his low back pain radiated into his legs, caused him to wake at night, and was worse in the morning.  (Tr. 587.)  He reported numbness and tingling in his legs and feet, worse on the left, and moved slowly.  (*Id*.)  Examination findings included: decreased range of motion; pain on flexion, extension, rotation, and side bend but full strength in all major myotomes; positive straight leg testing; positive Patrick's testing for back pain; positive heel walk and toe walk; and no motor or sensory deficits.  (*Id*.)  He was diagnosed with lumbar spondylosis and lumbar facet syndrome, with a notation regarding his lumbar laminectomy in 2005 and re-injury in June 2011.  (*Id*.)

Mr. Secka returned to see Dr. Ranieri on May 15, 2012.  (*Id*.)  He continued to report low back pain into his legs.  (Tr. 588.)  Examination findings included: decreased range of motion in the lumbar spine; pain on flexion, extension, rotation and side bend; decreased strength; positive straight leg testing bilaterally, left greater than the right; positive Patrick's testing for back pain; inability to heel walk and toe walk; antalgic gait; decreased sensation in L5-S1 distribution in legs and median nerve distribution in hands; and antalgic gait.  (*Id*.)  Mr. Secka was diagnosed with neuropathic pain of the lumbar spine area, lumbar spine neuritis, median neuropathy,

lumbar spondylosis, and lumbar facet syndrome.  (*Id*.)  Dr. Ranieri ordered testing, including spinal mapping of the lumbar area.  (*Id*.)  Mr. Secka had spinal mapping of his left lumbar spine on June 13, 2012.  (Tr. 590.)  The mapping was negative for pain at the L3 area but positive at L4 and L5.  (*Id*.)  Mr. Secka's medications were refilled and a discogram was preapproved.  (*Id*.)

When Mr. Secka returned to Dr. Raneiri on July 11, 2012, he reported falling in a rabbit hole about two weeks earlier.  (Tr. 603.)  He also reported tingling in his legs and constant numbness and burning in his left leg.  (*Id*.)  Physical examination findings were similar to findings from his May 2012 visit.  (*Compare* Tr. 603 *with* Tr. 588.)  His diagnoses were unchanged.  (*Id*.)  His medications were refilled, and further testing was discussed, including a lumbar discogram and EMG of the legs.  (Tr. 604.)

Mr. Secka returned to Dr. Ranieri on August 21, 2012, reporting that both legs were hurting since his fall the month before.  (Tr. 605.)  Examination findings were similar to prior findings, except Mr. Secka exhibited full strength in all major myotomes and his gait was tandem, not antalgic.  (*Id*.)  Dr. Ranieri noted that Mr. Secka had good results in the past from lumbar epidural steroid injections and indicated that injections would be scheduled.  (Tr. 606.)  During a September 19, 2012 visit with Dr. Ranieri, Mr. Secka expressed interest in trying a different or stronger medication.  (Tr. 607.)  He was taking Percocet.  (*Id*.)  Degenerative joint disease of the left knee was added to Mr. Secka's list of diagnoses.  (Tr. 607-08.)  No medication changes were noted.  (Tr. 608.)  Lumbar facet blocks were planned.  (*Id*.)

Mr. Secka received lumbar epidural steroid injections on October 17, 2012 and November 14, 2012.  (Tr. 610, 623-24, 625-26.)  Mr. Secka returned to Dr. Ranieri on December 14, 2012, reporting that the injections did not help.  (Tr. 627.)  He also reported that cramping in

his calves and feet had worsened.  (*Id*.)  Dr. Ranieri recommended stereotactic spinal mapping.

(Tr. 627-28.)  He refilled medications and added baclofen and tramadol.  (Tr. 628.)

Mr. Secka continued to report low back pain into his legs when he returned to Dr. Ranieri

on January 8, 2013.  (Tr. 629.)  He reported falling two weeks earlier.  (*Id*.)  Physical

examination findings were similar to findings from August 2012.  (*Compare* Tr. 629 *with* Tr.

605.)  Dr. Ranieri recommended an EMG of both legs and noted that they were awaiting

approval for lumbar mapping.  (Tr. 629-30.)

When Mr. Secka returned to Dr. Ranieri on March 5, 2013, his examination findings

were generally normal except for tenderness in the lumbar spine.  (Tr. 631-34.)  He was

diagnosed with: spondylosis lumbosacral without myelopathy, controlled; displacement of

lumbar intervertebral disc without myelopathy, controlled; post-laminectomy pain syndrome,

lumbar, controlled; and low back pain, controlled.  (Tr. 633-34.)  Dr. Ranieri refilled Mr. Secka's

Percocet; lumbar facet blocks and spinal mapping were planned.  (Tr. 634.)

Mr. Secka returned to see Dr. LoDico at Advanced Pain Medicine on January 15, 2014.

(Tr. 643-45.)  He reported he was treating his pain with Percocet three times a day, which helped

his pain without side effects.  (Tr. 643.)  However, he still reported his pain was a nine out of ten

at its worst and his pain was constant.  (*Id*.)  He was wearing a lumbar brace.  (Tr. 644.)  During

his physical examination, Mr. Secka was able to sit but appeared uncomfortable and changed

positions frequently.  (Tr. 643.)  He rose from a seated position with the assistance of arms and

his gait was non-antalgic.  (*Id*.)  He was unable to toe walk, heel walk, or squat.  (Tr. 643-44.)

He demonstrated mild tenderness to palpation over the right and left paraspinal muscles.  (Tr.

644.)  His muscle strength was 5/5 with bilateral hip flexion, knee flexion / extension, and ankle

dorsiflexion / plantar flexion.  (*Id*.)  Patellar and Achilles reflexes were absent.  (*Id*.)  Straight

leg raise was positive bilaterally.  (*Id*.)  He had normal sensation to light touch and normal temperature throughout his lower extremities bilaterally.  (*Id*.)  There were no palpable cords, muscle spasms, or true trigger points.  (*Id*.)  Dr. LoDico's impression was: "Lumbar spinal pain secondary to discogenic syndrome versus facet arthropathy lower extremity radicular syndrome with a 4 and 5 radiculopathy."  (*Id*.)  Dr. LoDico recommended a left transforaminal lumbar epidural steroid injection (*id*.) which was administered on January 17, 2014 (Tr. 646).

Mr. Secka returned to Dr. LoDico on February 3, 2014, reporting some relief from the injection in his left lower extremity but also reporting that he was having pain that radiated into his lower extremities and feet bilaterally.  (Tr. 649.)  He reported that he was not taking any narcotics.  (*Id*.)  He was wearing a lumbar brace.  (*Id*.)  Physical examination findings included: some mild tenderness to palpation over the lumbar paraspinal muscles; 5/5 muscle strength with bilateral hip flexion, knee flexion / extension, ankle dorsiflexion / plantar flexion; positive straight leg raise bilaterally; and normal sensation to light touch and normal temperature throughout the lower extremities bilaterally.  (*Id*.)  Dr. LoDico recommended a provocative discography once insurance was obtained (*id*.) and started Mr. Secka on Hydrocodone (Tr. 650).

On March 3, 2014, Mr. Secka reported that he continued to have pain in the low back, worse on his left side.  (Tr. 652.)  He reported partial relief with use of Hydrocodone, which had been prescribed because he had no insurance coverage.  (*Id*.)  His medication was changed to OxyContin because he had obtained insurance coverage.  (*Id*.)  Examination findings were similar to prior findings, but no tenderness over the paraspinal muscles was noted.  (*Compare* Tr. 652 *with* Tr. 649.)  A lumbar discography was recommended.  (Tr. 652.)

On April 1, 2014, Mr. Secka had a provocative discography at L5-S1, L4-5, and L3-4. (Tr. 655-658, 662.)  The discography showed an L5-Sl concentric tear pattern with degenerative

narrowing of disc and desiccation, borderline central stenosis, endplate marginal spur formation, and significant hypertropic changes of facets especially on the right side with the bilateral foraminal stenosis greater on the right.  (Tr. 662.)  There were normal nucleogram patterns at L2-3, L3-4, and L4-5.  (*Id.*)

Mr. Secka returned to Dr. LoDico on April 11, 2014, reporting some relief with use of OxyContin but did not feel it lasted very long.  (Tr. 659.)  Examination findings were similar to those from his March visit.  (*Compare* Tr. 659 *with* Tr. 652.)  Dr. LoDico increased Mr. Secka's OxyContin dose and discussed proceeding with a lumbar diskectomy at L5-S1.  (Tr. 659.)

Mr. Secka returned to Dr. LoDico on May 13, 2014.  (Tr. 1479.)  He reported having fallen in his yard a few weeks earlier and had a "weird feeling in his back" that he described as "squishy and grinding" and different from his typical low back pain with radiation.  (*Id.*)  He requested that he resume taking Hydrocodone in place of OxyContin because it provided him with better relief.  (*Id.*)  He was wearing a lumbar brace and physical examination findings included: 5/5 muscle strength with bilateral hip flexion, knee flexion / extension, ankle dorsiflexion / plantar flexion; absent patellar and Achilles reflexes; positive straight leg raise bilaterally; and normal sensation to light touch and normal temperature throughout the lower extremities bilaterally.  (*Id.*)  He was diagnosed with lumbar spinal pain secondary to discogenic syndrome shown by discography at L5-S1 and lower extremity radicular syndrome with a 4 and 5 radiculopathy.  (*Id.*)  Dr. LoDico replaced OxyContin with Hydrocodone.  (Tr. 1479-80.)

Vincent Miele, M.D., FAANS, FACS of Tri-State Neurological Associates-UPMC evaluated Mr. Secka on May 20, 2014.  (Tr. 709-12.)  Dr. Miele recommended a lumbar spine MRI and scoliosis series with flexion and extension views.  (Tr. 709.)  Mr. Secka returned to Dr.

LoDico in June 2014.  (Tr. 1482.)  His musculoskeletal strength was 5/5 on examination.  (*Id*.)
Dr. LoDico recommended that he continue to follow up with Dr. Miele.  (*Id*.)

The lumbar MRI and scoliosis series x-rays were completed on June 3, 2014 (Tr. 710,
1545-46) and reviewed by Dr. Miele during a follow-up visit on June 17, 2014 (Tr. 710).  Dr.
Miele noted that the "scoliosis series x-ray revealed a mild spinal curvature" and the lumbar
spine MRI showed "significant degenerative changes and post-laminectomy changes at L5-S1."
(*Id*.)  Dr. Miele explained to Mr. Secka that surgical intervention was an option, but he
recommended that Mr. Secka exhaust all conservative measures prior to considering surgery,
including a bariatric consultation, physical therapy, and smoking cessation.  (*Id*.)

Mr. Secka returned to Dr. LoDico on July 29, 2014.  (Tr. 1485.)  He reported that Dr.
Miele had recommended surgery, but his insurance would not cover it, so he was planning to be
seen at the Cleveland Clinic in about two months.  (*Id*.)  He reported that Hydrocodone provided
partial relief.  (*Id*.)  He was in no acute distress on examination.  (*Id*.)  His muscle strength was
4/5 throughout the lower extremities and his patellar and Achilles reflexes were intact.  (*Id*.)  Dr.
LoDico continued to prescribe Hydrocodone and added Vimovo.  (*Id*.)

On October 6, 2014, Mr. Secka was evaluated by Jahangir Maleki, M.D., in the
Neurological Center for Pain at the Cleveland Clinic.  (Tr. 720-22.)  On examination, Dr. Maleki
observed that Mr. Secka was "markedly deconditioned, [he] walk[ed] with forward flexed upper
body; there [was] palpation and ROM pain across his lumbar spine and palpation pain in his
calves, 4+ EHL weakness, [and] mildly decreased PP/LT over B/L L5, [he] [had] some difficulty
with heel gait; [his] ankle jerks [were] diminished [and] other DTR 1+; plantars [were] flexor."
(Tr. 722.)  Dr. Maleki's impression was: spondylosis with disc disease and spinal arthropathy;
paraspinal myofascial pain and bilateral L5 radiculopathy; and chronic pain with physical and

18

psychosocial dysfunction.  (*Id.*)  Dr. Maleki noted that Mr. Secka did have "some foraminal narrowing and radicular symptoms," but he felt that Mr. Secka's "pain and decondition [were] clearly out of proportion to his pathology."  (*Id.*)  Dr. Maleki felt that "[g]iven the chronic nature, exten[t], complexity and [Mr. Secka's] failure to respond to outpatient modalities of treatment, he [was] an appropriate candidate for an intensive Chronic Pain Rehabilitation Program."  (*Id.*)  He was provided with information regarding the program.  (*Id.*)

Mr. Secka returned to Dr. Plowey on October 14, 2014.  (Tr. 1488.)  He continued to report lumbar spinal pain radiating into his lower extremities.  (*Id.*)  He reported Hydrocodone and Vimovo helped, but noted that his insurance was not going to continue covering Hydrocodone.  (*Id.*)  His musculoskeletal strength was 5/5, he could ambulate without assistance, he could transition from a seated to standing position without difficulty, and his patellar and Achilles reflexes were intact.  (*Id.*)  Dr. Plowey prescribed OxyContin and Vimovo.  (Tr. 1489.)  Mr. Secka returned to Dr. LoDico the following month.  (Tr. 1491.)  He continued to report back pain, but said the OxyContin was helping.  (*Id.*)  His musculoskeletal strength was 5/5 and his patellar and Achilles reflexes were intact.  (*Id.*)  However, unlike the prior month, he ambulated with the assistance of a cane.  (*Id.*)  No changes were made to his medications.  (Tr. 1492.)

Mr. Secka returned to Dr. LoDico on January 6, 2015, reporting that his insurance company would no longer cover out-of-state prescriptions, so he planned to look for a new pain management provider in Ohio where he lived.  (Tr. 1494-96.)  On examination, his lower extremity strength testing was 5/5 and his patellar and Achilles reflexes were intact.  (Tr. 1494.)  There was normal tone and muscle bulk in all four extremities with no dermatomal loss to light touch.  (*Id.*)  Dr. LoDico continued Mr. Secka on OxyContin and Vimovo and recommended that

19

Mr. Secka repeat nerve blocks and rhizotomies once he could afford the procedures, noting he had good relief following rhizotomies in the past.  (Tr. 1494-95.)

Mr. Secka began treatment with Mark Peckman, D.O., at the Pain Management Center on February 5, 2015 for his low-back pain, lumbar radiculopathy, and lumbar post-laminectomy syndrome.  (Tr. 1293.)  He reported doing well on OxyContin, but also reported he continued to experience "breakthrough discomfort."  (*Id*.)  He reported that his pain interfered with his social relationships, general activity, and enjoyment of life.  (*Id*.)  He was using a cane for ambulation during the evaluation and was observed to favor his right side.  (Tr. 1294.)  He had pelvic tilt, left side down, positive straight leg raise, achilles-patellar deprivation left over right, weakness against dorsi plantar flexion, ambulatory gait disturbance, intersegmental spinous tightening, and facet joint medial and lateral branch irritation.  (*Id*.)  His was diagnosed with low-back pain, lumbar radiculopathy, lumbar facet joint osteoarthritis, and lumbar strain / sprain.  (*Id*.)  Dr. Peckman decreased the OxyContin dosage, added immediate release Oxycodone to address his reports of "breakthrough discomfort," and recommended epidural steroid injections.  (*Id*.)

Mr. Secka received several epidural and trigger point injections in February and March 2015.  (Tr. 1286-89, 1290-92.)  Following those injections, Mr. Secka returned to Dr. Peckman on April 2, 2015.  (Tr. 1285.)  Dr. Peckman noted a good response to the injections and indicated the radicular component was relatively stable, but also noted that Mr. Secka's pain was chronic and he had dysfunction of ambulatory gait and stride and used a cane for ambulation.  (*Id*.)  Dr. Peckman also noted some weakness, left over right, facet joint medial branch irritation with hyperextension, and limited lateral extension.  (*Id*.)  He recommended right and left L3 through S1 reablation to the medial branches.  (*Id*.)

20

Mr. Secka underwent a right medial branch radiofrequency neurolysis ablation at L3-S1 on April 20, 2015 and a left medial branch radiofrequency neurolysis ablation at L3-S1 on April 27, 2015.  (Tr. 1530-31.)  During his follow up with Dr. Peckman on April 30, 2015, Mr. Secka was doing "extremely well" following the medial branch radiofrequency neurolysis ablation, but Dr. Peckman noted concern regarding Mr. Secka's reported refractory pain to the lateral branches to the sacral dermatomes.  (Tr. 1529.)  The radicular component of his pain seemed stable with epidural steroid injections, but he continued to report mid to lateral back discomfort with myalgia/myositis and strain/sprain.  (*Id*.)  He also reported some cervical thoracic junction strain/sprain.  (*Id*.)  Dr. Peckman provided a prescription for a new TENS unit because Mr. Secka reported that his older unit had been malfunctioning.  (*Id*.)

Mr. Secka received sacroiliac blocks on July 17, 2015 and July 31, 2015.  (Tr. 1523, 1525.)  The blocks were effective in reducing his pain, but he continued to have chronic irritability with his underlying lumbar radiculopathy and lumbar facet joint syndrome.  (Tr. 1522, 1524.)  He continued to have pain syndrome associated to the lumbosacral junction with ambulation, and used a cane for ambulation.  (Tr. 1522.)  He demonstrated some minor weakness against dorsal plantarflexion on examination.  (*Id*.)  His muscle tone was adequate and his sensory exam was good.  (*Id*.)  Dr. Peckman indicated the sacroiliac joints were stabilized.  (*Id*.)

Mr. Secka received three lumbar trigger point injections in October 2015.  (Tr. 1517-19.) In November 2015, he received right and left lateral L5 through S3 radiofrequency neurolysis ablations to address his low-back pain, lumbar facet joint osteoarthritis, and lumbosacral iliac dysfunction.  (Tr. 1514-15.)

Mr. Secka followed up with Dr. Peckman on November 18, 2015.  (Tr. 1513.)  Dr. Peckman indicated that Mr. Secka "had quite a bit of reduction in his pain and . . . improvement

in his overall range of motion," but he had "spasm to the cervical, thoracic and lumbar spine."
(*Id.*)  He exhibited dysfunctional ambulation and used a cane for assistance.  (*Id.*)  He exhibited
"right sided dependency with pelvic tilt, right side down," which "displace[d] his lumbar
paravertebrals."  (*Id.*)  Dr. Peckman prescribed Zanaflex for spasms.  (*Id.*)

Mr. Secka returned to Dr. Peckman on December 17, 2015.  (Tr. 1512.)  He was using a
cane on the right side.  (*Id.*)  His examination showed: a significant radicular component;
irritability to the lower extremities; dysfunction and instability to his ambulatory gait and stride;
a pelvic tilt, left side down; decreased dorsal plantar flexion; decreased Achilles, left over right.
(*Id.*)  There was also sacroiliac dysfunction, but Dr. Peckman noted that the lateral and medial
branch radiofrequency had been beneficial with no significant anterior lateral dermatome
distributional pain.  (*Id.*)  Mr. Secka wanted to wait to see how he progressed before proceeding
with additional injections.  (*Id.*)  Dr. Peckman renewed Oxycontin and Percocet.  (*Id.*)

### 2. Relevant Opinion Evidence

The Court summarizes below the medical opinions identified in the parties' briefs, but
observes that some medical opinions were rendered outside of the relevant insured period.

### i. Consultative Examination

On December 27, 2017, Mr. Secka presented to Khalid Darr, M.D., of Tri-State
Occupational Medicine, Inc. for an orthopedic consultative examination (Tr. 1319-33.)  Dr. Darr
observed generally that: Mr. Secka used a handheld assistive device and ambulated with a
somewhat antalgic gait when he did not use the device; he was stable at station; and he was
comfortable in the supine and sitting positions.  (Tr. 1319.)  On examination of the lumbar spine,
there was no evidence of paravertebral muscle spasm, no tenderness to percussion of the
dorsolumbar spinous processes, straight leg raise test was normal, and Mr. Secka could stand on

one leg at a time without difficulty.  (Tr. 1321.)  Range of motion testing revealed decreased range of motion in the dorsolumbar spine.  (Tr. 1325.)  A neurological examination revealed normal motor strength in all extremities.  (Tr. 1321.)  His patellar and Achilles reflexes were normal.  (*Id*.)  Mr. Secka could walk on his heels and toes and perform tandem gait and squat without difficulty.  (*Id*.)

Dr. Darr offered inconsistent opinions regarding Mr. Secka's physical functional abilities. For example, he opined in his report that Mr. Secka's ability to stand and walk was "limited to three to four hours per day" and he could "lift and carry between 15 and 20 pounds frequently and over 20 pounds occasionally."  (Tr. 1322.)  Yet, in a medical source statement with the same date, he opined: Mr. Secka could lift and carry up to ten pounds frequently and up to twenty pounds occasionally, and could stand and/or walk for up to six hours.  (Tr. 1327-28.)  Dr. Darr consistently opined that Mr. Secka's use of a cane was medically necessary and he had some postural and environmental limitations (Tr. 1320, 1322, 1328, 1330), but that his ability to perform activities of daily living was intact, including driving a vehicle and traveling without difficulty (Tr. 1322, 1332.)

### ii.    Medical Expert

Medical expert John Kwock, M.D., who was board certified in orthopedic surgery, testified at the June 11, 2018 administrative hearing.  (Tr. 811, 839-52, 1442-43.)  Dr. Kwock was informed that Mr. Secka's date last insured was December 31, 2015, and was asked to offer his opinion as to Mr. Secka's medical status.  (Tr. 840.)  Dr. Kwock testified that Mr. Secka had two medically determinable impairments that were severe under the SSA's definition: status post lumbar diskectomy remotely; and residual degenerative disc and degenerative joint disease in the lumbar spine.  (Tr. 840-41.)  Dr. Kwock opined that Mr. Secka did not have an impairment or

23

combination of impairments that met or equaled a listing, but that his impairments would require limitations in his work environment. (Tr. 841-42.) Dr. Kwock then offered his opinion as to those functional limitations, opining that: Mr. Secka had the residual functional capacity to perform light work, meaning he could lift and carry up to ten pounds frequently and twenty pounds occasionally; he could sit for six hours out of an eight-hour workday; he could walk for six hours out of an eight-hour workday; he could frequently balance, kneel, and climb stairs and ramps; he could occasionally stoop, crouch, crawl, and climb ladders and scaffolds; and he could be exposed occasionally to heights and moving machinery. (*Id*.) Dr. Kwock stated that his opinion was based on his review of the record medical evidence, including Dr. Darr's medical source statement, physical examination findings, radiological and diagnostic studies, and operative reports. (Tr. 842-43.) Dr. Kwock indicated that the residual functional capacity that he detailed applied to the period of June 2010 through December 2015. (Tr. 843-44.)

Mr. Secka's counsel asked Dr. Kwock whether he was aware of an October 2011 EMG with findings consistent with polyradiculopathy and whether symptoms in the lower extremities would be expected. (Tr. 844.) Dr. Kwock explained that the EMG showed that at some point in time Mr. Secka had sustained injuries to the nerve root that caused changes that had not healed to the point where those changes would be absent from an EMG. (Tr. 844-45.) However, it did not show evidence of a recurrent or another active pinching of the nerve. (Tr. 844-45.)

Mr. Secka's counsel also asked Dr. Kwock about the purpose of radiofrequency ablation and whether it was reasonable to assume that Mr. Secka was still having pain since he was scheduled to undergo a radiofrequency ablation in April 2015, which was after the EMG, surgery, and rhizotomy. (Tr. 845-46.) Dr. Kwock explained that the goal of radiofrequency ablation was to kill the nerves covering the facet joint to eliminate the sensation of pain from that

joint. (*Id*.) Dr. Kwock testified that it was reasonable to assume that Mr. Secka was still reporting pain at that point. (Tr. 846.) Dr. Kwock also explained that injections of the type that Mr. Secka had were administered to try to manage a patient's symptoms. (*Id*.) Dr. Kwock testified that it would be reasonable for a neurosurgeon in October 2011 to conclude that Mr. Secka was a potential candidate for a spinal cord stimulator if Mr. Secka was having symptoms at that time because the purpose of a spinal cord stimulator was treatment of symptoms. (*Id*.) He also opined that Mr. Secka's reports of pain were reasonable since he still had residual degenerative disc and degenerative joint disease in his lumbar spine and his "symptoms very easily could be coming from those disease processes." (Tr. 846-47.) Dr. Kwock testified that it would be reasonable for someone with degenerative conditions like Mr. Secka to have good and bad days, and that there were no metrics to predict when an individual would have a good or bad day. (Tr. 848.) However, when pressed by Mr. Secka's counsel as to his opinion as to the number of days Mr. Secka would be absent from work due to his pain, Dr. Kwock opined that the changes that were present in Mr. Secka's spine were mild in nature and the changes were not enough to result in consistent and regular absenteeism from work. (Tr. 851-52.)

Dr. Kwock considered and relied on the opinion of Dr. Darr, but explained that he did not agree with Dr. Darr's finding that Mr. Secka needed a cane to ambulate. (Tr. 849.) Dr. Kwock explained that the documented examination findings, which included 5/5 motor strength bilaterally, well-preserved sensation, 2+ and symmetrical deep tendon reflexes in the lower extremities, and normal straight leg raise test sitting and supine, did not support the necessity of the use of a cane. (*Id*.) Dr. Kwock also explained that he did not agree with Dr. Darr's opinion that Mr. Secka would require sitting limitations with elevation of the lower extremities, explaining that spine issues do not produce swelling of the legs or symptoms to be managed with

25

elevation of the legs.  (*Id*.)  He also explained that someone with a lumbar spine problem would likely not want to elevate his legs because he would be sitting in a position like a straight leg raise test.  (Tr. 849-50.)

### iii. State Agency Reviewers

On October 10, 2012, state agency reviewing physician Eli Perencevich, D.O., reviewed the record and opined that Mr. Secka had the following physical functional limitations:

- lift and carry up to twenty pounds occasionally and ten pounds frequently;

- stand/walk for about six hours total in an eight-hour workday;

- sit for about six hours total in an eight-hour workday;

- never claim ladders, ropes, or scaffolds;

- occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs;

- frequently reach overhead bilaterally; and

- avoid even moderate exposure to unprotected heights.

(Tr. 114-16.)  On March 15, 2013, state agency reviewing physician Gerald Klyop, M.D., reviewed the record and concurred with the opinion of Dr. Perenccevich.  (Tr. 146-48.)[2]

On August 31, 2016, state agency reviewing physician Rannie Amiri, M.D., reviewed the record after Mr. Secka filed his June 2016 application.  (Tr. 925.)  Dr. Amiri opined that Mr. Secka had the following physical functional limitations:

- lift and carry up to twenty pounds occasionally and ten pounds frequently;

- stand/walk for about six hours total in an eight-hour workday;

- sit for about six hours total in an eight-hour workday;

- occasionally stoop, kneel, crouch, crawl, balance, and climb ramps or stairs;

---

[2] An agency review was conducted earlier in connection with the claim filed on December 15, 2011.  (Tr. 96-105.)  That application was denied on January 25, 2012, without appeal.  (Tr. 739.)

- never claim ladders, ropes, or scaffolds;

- occasionally reach overhead bilaterally; and

- avoid exposure to unprotected heights and operating dangerous machinery.

(Tr. 932-34.)  On reconsideration, state agency reviewing physician Elizabeth Das, M.D., reviewed the record October 31, 2016 and opined that Mr. Secka had the same physical functional limitations as Dr. Amiri found him to have.  (Tr. 943-944, 946.)

### iv.     Independent Medical Examination for Workers Compensation

Mr. Secka was evaluated by James L. Cosgrove, M.D., on July 14, 2011 regarding his June 2010 work-related injury.  (Tr. 383-95.)  Although Mr. Secka subjectively reported severe pain, Dr. Cosgrove found "no objective correlation to any specific anatomic structure of physiologic process."  (Tr. 391.)  Dr. Cosgrove noted that radiograph reports of prior diagnostic studies were available but the diagnostic studies themselves were not available for his review.  (*Id*.)  He opined that Mr. Secka had a lumbar strain as a result of the work-related accident in June 2010.  (Tr. 393.)  Mr. Secka had limitation in his range of motion, but Dr. Cosgrove felt it appeared to be more "presentation style than any specific injury or impairment."  (*Id*.)  Based on the information available the time of his evaluation, Dr. Cosgrove opined that Mr. Secka could "return to full and active work duties without restriction."  (Tr. 392.)

### C.     Hearing Testimony

### 1.     Plaintiff's Testimony

Mr. Secka testified in response to questioning by the ALJ and his representative at the June 15, 2020 hearing.[3]  (Tr. 779-99.)  He reported he was unable to work because he was in

---

[3] Unless otherwise noted, the testimony related to the relevant period of June 1, 2010 through December 31, 2015.

agony when sitting for long periods and standing for even short periods.  (Tr. 788, 789-90.)  He reported that his back pain traveled into his knees and feet.  (Tr. 793.)  He could stand for only two or three minutes before becoming hunched over on his knees or cane.  (Tr. 789-90.)  He could walk 50 or 60 yards before his leg and back pain would set in and cause him to have to stop to take a break or sit down.  (Tr. 790.)  He used a cane for balance and because he lost feeling in his legs.  (*Id*.)  He started using a cane in 2013 or 2014, which was prescribed by one of his physicians.  (*Id*.)

Mr. Secka reported that nerve blocks and injections helped relieve his pain, but the relief was short-lived.  (Tr. 789.)  If the injections worked well, he would receive some relief for about two months.  (Tr. 796.)  He used a TENS unit every day and on bad days he would use it five or six times in a day for about fifteen minutes at a time.  (Tr. 795.)  His pain fluctuated from day-to-day and affected his concentration.  (Tr. 791, 797.)  He explained that he could walk about 100 yards on a good day, but on a bad day could not move except to crawl to the bathroom or try to get something to drink.  (Tr. 792.)  He estimated having a bad day at least once a week.  (*Id*.)  He rated his pain on an average day with medication as a seven or eight, with zero being no pain and ten being pain that required emergency medical treatment.  (*Id*.)   With injections his pain level would decrease to about a five.  (Tr. 796.)

Mr. Secka reported problems lifting objects because of his back problems.  (Tr. 792.)  He could not lift a gallon of milk without it causing him pain.  (Tr. 793.)  He received help from friends, family, and neighbors with household chores, yardwork, and lifting heavy items.  (Tr. 793-94.)  He was generally able to take care of his personal hygiene.  (Tr. 794.)  Mr. Secka typically spent his days lying down, which was the most comfortable position for him.  (Tr. 795.)  He generally left the house only to go to the store or medical appointments.  (Tr. 796.)  He could

generally drive himself, but needed a driver for epidurals, nerve blocks, or radio ablations.  (Tr. 781, 796.)  He helped care for a toddler several years earlier, for about three months.  (Tr. 798.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the June 15, 2020 hearing.  (Tr. 799-809.)  The VE classified Mr. Secka's past relevant work as: (1) tractor trailer truck driver, SVP 4, medium per the Dictionary of Occupational Titles ("DOT"), very heavy as performed; (2) heating and air conditioning installer, servicer, SVP 7, medium per the DOT, very heavy as performed; (3) refrigeration mechanic, SVP 8, heavy per the DOT, very heavy as performed; and (4) electrical appliance repairer, SVP 7, medium per the DOT, very heavy as performed.  (Tr. 801-02.)

The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the limitations described in the ALJ's RFC determination, could not perform Mr. Secka's prior work, but could perform representative positions in the national economy, including: addresser, with an estimated 3,000 jobs nationally; election clerk, with an estimated 6,700 jobs nationally; and table worker, with an estimated 1,000 jobs nationally.  (Tr. 802-06.) The VE testified that the list of jobs she provided was not an exhaustive list, but that the job numbers for any other sedentary, unskilled production type jobs would not be as high as the jobs she identified.  (Tr. 809.)  She testified that competitive employment would be precluded if an individual was off task 15% of the time or had more than one unexcused or unscheduled absence per month.  (Tr. 805.)  She also testified that there would be no jobs available for an individual with the limitations described in the ALJ's RFC determination if the individual was also limited to occasional reaching in all directions.  (Tr. 806-07, 808.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is

capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In her August 5, 2020 decision, the ALJ made the following findings:[4]

1.    The claimant meets the insured status requirements of the Social Security Act only through December 31, 2015, making the "relevant insured period" June 1, 2010, date of alleged onset, through December 31, 2015. (Tr. 743.)

2.    The claimant did not engage in substantial gainful activity during the relevant insured period.  (*Id.*)

3.    The claimant had the following severe impairments during the relevant insured period: degenerative disc and joint disease of the lumbosacral spine with chronic pain, radicular symptoms, and other residual effects, status post remote (2005) L5-S1 microdiscectomy (post laminectomy syndrome); and obesity.  (Tr. 743-47.)

4.    The claimant did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 during the relevant insured period. (Tr. Tr. 747-50.)

5.    Throughout the relevant insured period, the claimant had the residual functional capacity to perform a range of sedentary exertional work activity with the ability to use a cane or other assistive device for ambulation or balance and the ability within thirty-minute intervals to alternate from sitting or standing position for up to two minutes, without breaking task, and that: requires no climbing of ladders, ropes, or scaffolds, and no more than occasional performance of other postural movements (i.e., balancing, climbing of ramps or stairs, crawling, crouching, kneeling

---

[4] The ALJ's findings are summarized.

or stooping); entails no concentrated exposure to cold or hot temperature extremes or excessive vibration, and less than even moderate/occasional exposure to hazards (e.g., dangerous moving machinery, unprotected heights); and involves only simple, routine and repetitive tasks.  (Tr. 750-53.)

6.    The claimant was unable to perform any "vocationally relevant" past work during the relevant insured period.  (Tr. 754.)

7.    The claimant was considered a "younger individual age 18-44" throughout the relevant insured period.  (*Id*.)

8.    The claimant had at least a high school education.  (*Id*.)

9.    Transferability of previously acquired job skills was not material.  (*Id*.)

10.    Considering the claimant's age, education, work experience, and residual functional capacity during the relevant insured period, there were jobs that existed in significant numbers in the national economy that the claimant could perform, including addresser, election clerk, and table worker.  (Tr. 754-55.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, at any time during June 1, 2010, the alleged onset date, through December 31, 2015, the date last insured.  (Tr. 755.)

## V.    Plaintiff's Arguments

Mr. Secka argues: (1) the ALJ erred in her evaluation of his pain and its impact on his residual functional capacity (ECF Doc. 9 pp. 15-21); and (2) the ALJ failed to meet her burden of identifying jobs in significant numbers that could accommodate his functional limitations (*id.* at pp. 21-24).

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d at 654 ("Generally, … we review decisions of administrative agencies for harmless error.").  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**     **First Assignment of Error: Whether ALJ Properly Considered Subjective Reports of Pain Under SSR 16-3p and Sufficiently Articulated Basis for RFC Finding**

Mr. Secka argues that the ALJ's RFC determination is not supported by substantial evidence because she did not conduct an adequate evaluation of his pain.  (ECF Doc. 9 pp. 15-21.)  He asserts that the "the ALJ rejected [his] pain as debilitating in light of the diagnostic test results and the treatment history and observations," but erroneously parsed the medical record "rather than evaluate the intensity, persistence, and limiting effects of the symptoms on [his] ability to do basic work activities as required in SSR 16-3p."  (ECF Doc. 9 pp. 16-21.)  He also contends that there is no logical bridge between the evidence and the ALJ's conclusions regarding his reports of disabling pain.  (*Id.*)

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007)

34

(citing 20 C.F.R. § 416.929(a)). If that requirement is met, the second step is to evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities. SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247. When the alleged symptom is pain, the ALJ should evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 404.1529(c). *See Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994). Factors relevant to a claimant's reported pain include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3). There is no dispute that the first step is met in this case (ECF Doc. 9, p. 15; Tr. 750), so the discussion herein will focus on the second step.

A review of the ALJ's decision reveals she considered the entire record, based her findings on multiple relevant factors, and provided "specific reasons for the weight given to the individual's symptoms," SSR 16-3p, 82 Fed Reg. 49462, 49467. The ALJ acknowledged Mr. Secka's hearing testimony and subjective allegations of debilitating pain. (Tr. 750-52.) Nevertheless, she concluded that Mr. Secka's "assertions concerning the intensity, duration and limiting effects of such symptoms" were not "fully persuasive, as they [were] not entirely consistent with or otherwise adequately supported by objective and other longitudinal evidence of record." (Tr. 750-51.) The ALJ did not ignore his pain complaints. Indeed, she accounted for his alleged pain when formulating an RFC which limited him to a reduced range of sedentary work. More particularly, the ALJ found that Mr. Secka had the RFC to:

> perform a range of "sedentary" exertional work activity that 1) accommodates the use of a cane or other assistive device for ambulation or balance and 2) affords opportunity within 30-minute intervals to alternate from sitting or standing position for up to 2 minutes, without breaking task, and that: requires no climbing of ladders,

ropes or scaffolds, and no more than occasional performance of other postural movements (i.e., balancing, climbing of ramps or stairs, crawling, crouching, kneeling or stooping); entails no concentrated exposure to cold or hot temperature extremes or excessive vibration, and less than even moderate/occasional exposure to hazards (e.g., dangerous moving machinery, unprotected heights); and involves only simple, routine and repetitive tasks.

(Tr. 750 (internal citations omitted).)  Mr. Secka argues that the ALJ nevertheless erred in finding that his diagnostic imaging and tests did not support his complaints of debilitating pain, and that his treatment history and observations did not support his complaints of debilitating pain.  (ECF Doc. 9 pp. 16-21.)  The Court considers each of these arguments more fully below.

### 1.  Whether ALJ Appropriately Considered and Relied on Diagnostic Imaging and Tests When Evaluating Mr. Secka's Subjective Reports of Pain

First, Mr. Secka argues that his diagnostic test results supported his subjective reports of pain, and that the ALJ did not consider "critical" testimony from medical expert Dr. Kwock which suggested his subjective reports were reasonable in light of those results.  (ECF Doc. 9 pp. 16-18.)  He argues the ALJ selectively parsed, or "cherry-picked," the record in analyzing Mr. Secka's subjective reports of pain, resulting in an RFC which was not supported by substantial evidence.  (*Id*.)  For the reasons explained below, the Court finds these arguments without merit.

### i.  ALJ's Consideration of Diagnostic Imaging and Test Results was Accurate and Consistent with Requirements of SSR 16-3p

In support of her finding that Mr. Secka's testimony regarding his spinal symptoms was not entirely consistent with or supported by the evidence of record, the ALJ explained:

With regard to claimant's spinal impairments, an examination of the record from the relevant period fails to support a finding that the claimant's symptoms rose to the level of debilitating. Specifically, throughout the relevant treatment period the claimant has had multiple diagnostic images and tests performed on [his] lumbar spine, all of which fail to support the severity alleged by the claimant. For example, in October of 2011, the claimant's lumbar spine was unchanged from June of 2010, and he was found to have a "mild diffuse disc bulge at L5-S1 although no significant central canal narrowing is seen. Mild bilateral neural foraminal and narrowing and lateral recess narrowing is unchanged." Electromyography (EMG)

in October 2010 revealed bilateral L5 and right L5 radiculopathy, bilateral tibial moto mononeuropathy, and bilateral sural mononeuropathy. However, EMG study one year later in October 2011 was "most consistent with a chronic lumbosacral polyradiculopathy," and the study found "no abnormalities suggestive of a recurrent acute lumbosacral radiculopathy." In June 2014, the claimant had an MRI that revealed bilateral L5 foraminal narrowing and L5-S1 disc degeneration. In April 2014 another image showed "concentric tear pattern with degenerative narrowing of disc and dislocation, borderline central stenosis, endplate marginal spur formation, and significant hypertrophic changes of facets especially on the right side with the bilateral foraminal stenosis greater on the right" at L5-S1, but normal findings from L1 through L5. The mild to moderate findings reflected [in] diagnostic images and tests fail to support a finding that his spinal conditions are debilitating. However, these findings clearly indicate that the claimant suffers from some limitations with regard to his spinal conditions, all of which are adequately accommodated through a limitation to only "sedentary" exertional work (with use of a cane and a sit/stand option) with the additional postural, environmental, and nonexertional limitations described above.

(Tr. 751-52 (citations omitted) (emphasis added).)  The ALJ's consideration of the diagnostic imaging and tests when evaluating Mr. Secka's pain complaints was consistent with SSR 16-3p, which explains that when "considering the intensity, persistence, and limiting effects of an individual's symptoms, [SSA] examine[s] the entire case record, including the objective medical evidence . . .".  SSR 16-3p, 82 Fed Reg. 49462, 49464.

In support of his argument that the ALJ's analysis of the diagnostic test results does not build an accurate and logical bridge between the evidence and the result, Mr. Secka does not identify specific diagnostic testing that the ALJ mischaracterized or failed to account for in her analysis.  Indeed, a review of the diagnostic evidence cited in Mr. Secka's brief reveals that it is consistent with the evidence explicitly discussed and considered in the ALJ decision.  (*Compare* ECF Doc. 9, pp. 16-17 *with* Tr. 751-52.)  Further, to the extent any specific imagery was not discussed by the ALJ, it is well-established that she was not required to discuss every piece of evidence in order to render a decision supported by substantial evidence.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (holding an ALJ is not "required to

discuss each piece of data in [her] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion") (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).

To the extent Mr. Secka is simply arguing that the diagnostic evidence considered and discussed by the ALJ supports a different finding, i.e., that his subjective complaints of pain are supported by the diagnostic test results, his argument mistakes the legal standard. "The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406. Because it is not a reviewing court's role to "try the case *de novo*, nor resolve conflicts in evidence," *Garner*, 745 F.2d at 387, this Court cannot overturn the Commissioner's decision "so long as substantial evidence . . . supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Thus, the question is not whether substantial evidence supports Mr. Secka's reading of the evidence. Rather, the question is whether Mr. Secka has shown that the ALJ's contrary reading of the evidence was <u>not</u> supported by substantial evidence.

Here, the ALJ explained that the "mild to moderate findings" reflected in Mr. Secka's diagnostic imaging and test results "fail[ed] to support a finding that [Mr. Secka's] spinal conditions [were] debilitating." (Tr. 752.) She found those findings instead supported a finding that he suffered from limitations that were "adequately accommodated through a limitation to only 'sedentary' exertional work (with use of a cane and a sit/stand option) with the additional postural, environmental, and nonexertional limitations described" in the RFC. (*Id*.) The Court finds that this conclusion was supported by substantial evidence, and that the ALJ sufficiently explained how she considered the diagnostic imagining and test results when she determined that Mr. Secka's pain was not as limiting as he alleged.

ii.    **ALJ Appropriately Addressed Dr. Kwock's Testimony**

Mr. Secka also argues that the ALJ erred under SSR 16-3p by failing to address a

"critical portion" of Dr. Kwock's testimony, specifically testimony concerning the relation

between certain diagnostic tests and treatments and Mr. Secka's subjective complaints of pain.

(ECF Doc. 9 pp. 17-18.)  In particular, he references Dr. Kwock's testimony that:

- EMG abnormalities showed non-acute persistent changes that had not really healed; and

- Mr. Secka's reports of pain were reasonable given his residual degenerative disc and degenerative joint disease, and his symptoms could very easily stem from those disease processes.

(*Id*. (citing Tr. 845-47).)

The first referenced testimony was in response to a question from Mr. Secka's attorney as

to whether EMG findings consistent with polyradiculopathy "would be expected to produce

symptoms in the lower extremities."  (Tr. 844.)  Dr. Kwock explained that the EMG in question

showed Mr. Secka had sustained injuries to the nerve root at some point in time which caused

changes that had not yet healed to the point where those changes would be absent from an EMG.

(Tr. 844-45.)  However, he indicated that the EMG did not show evidence of a recurrent or other

active pinching of the nerve.  (Tr. 844-45.)

The second referenced testimony was in response to further questioning from Mr.

Secka's attorney, as follows:

Q:    Now, the claimant underwent a radio - - excuse me, he was scheduled to undergo a radiofrequency ablation in April of '15, well after the EMG, well after the surgery, well after the rhizotomy. Is it reasonable to conclude that he was still having pain at that point?

A:    Well, it's reasonable to make the following assumption, that the patient would still be reporting pain.

Q:      He's had a number of injections since that time as well. Until just recently, he's had injections. Are the injections given or administered to help alleviate the pain?

A:      That is the goal of that type of treatment. It's a symptomatic treatment. You're trying the manage whatever symptoms the patient is having from those types of treatments.

Q:      In October of 2011, the claimant was seen by a neurosurgeon. The claimant was seen by a neurosurgeon who indicated the claimant was a potential candidate for a spinal cord stimulator. Is there any reason to disagree with that opinion?

A:      No, again, a spinal cord stimulator is for the purpose of treatment [of] symptoms. So, if he's having symptoms, then it's reasonable to offer this to him.

Q:      So, in light of the claimant's conditions, his medically determinable severe impairments, the report of pain, is it reasonable in light of his conditions?

A:      Yeah, it's reasonable give[n] the fact that he still has residual degenerative disc and degenerative joint disease remaining in the lumbar spine. So, his symptoms very easily could be coming from those disease processes.

(Tr. 846-47.)

Mr. Secka argues that the ALJ erred by failing to address the above testimony, which he characterizes as evidence that his EMG demonstrated persistent changes that had not healed, and evidence that his reports of pain were reasonable because "his symptoms could very easily be coming from [his] disease processes."  (ECF Doc. 9, p. 17 (quoting Tr. 847).)  In fact, there is nothing in Dr. Kwock's testimony regarding the 2011 EMG results that is inconsistent with the ALJ's own description of the same diagnostic results.  (*Compare* Tr. 844-45 *with* Tr. 751.)  Similarly, the ALJ's findings are consistent with Dr. Kwock's testimony that Mr. Secka's impairments could reasonably cause pain and that his various treatment modalities are intended to treat complaints of pain.  (Tr. 846-47.)  The ALJ also found that Mr. Secka's "medically determinable impairments could reasonably be expected to produce some of the symptoms that [Mr. Secka] has alleged," before concluding that Mr. Secka's testimony "and other attributed

40

assertions concerning the intensity, duration and limiting effects of such symptoms are not found to be fully persuasive, as they are not entirely consistent with or otherwise inadequately supported by objective and other longitudinal evidence of record."  (Tr. 750-51.)

In fact, the ALJ formulated a more restrictive RFC than the limitations Dr. Kwock found to be supported by the medial records.  Dr. Kwock found the record would support an ability to perform light work (Tr. 841-42), but the ALJ found Mr. Secka had the RFC to perform a reduced range of sedentary work (Tr. 750).   The ALJ addressed Dr. Kwock's testimony as follows:

> The opinion of John F. Kwock, M.D. is afforded only partial weight (28F/1). Dr. Kwok testified at the claimant's prior hearing on June 11, 2018, regarding the claimant's residual functional capacity prior to December 31, 2015. He opined that the claimant had the capacity during the relevant insured period to perform "light" work. For reasons stated, the undersigned has limited the claimant to "sedentary" exertion. Furthermore, Dr. Kwock opined that the claimant was only limited to frequent climbing of ramps/stairs, kneeling, or balancing. He further stated that the claimant was limited to occasional climbing of ladders, ropes, and scaffolds, as well as stooping, crouching, and crawling. He also opined that the claimant had environmental limitations to only occasional heights and moving machinery. As indicated by the analysis above, the undersigned has found the claimant to have more significant exertional and nonexertional limitations than were indicated by Dr. Kwock.

(Tr. 753.)

Considering the foregoing, the Court finds that the ALJ appropriately considered and explained her consideration of both Mr. Secka's diagnostic test results and Dr. Kwock's testimony when assessing Mr. Secka's subjective reports of pain and final RFC.

### 2.     Whether ALJ Appropriately Considered and Relied on Treatment History and Observations When Evaluating Mr. Secka's Subjective Reports of Pain

Mr. Secka next argues that the ALJ "curiously and erroneously relied on a lack of evidence *before Mr. Secka's alleged disability onset date*" in finding his pain was not debilitating.  (ECF Doc. 9, p. 18 (emphasis in original).)  He further argues that the ALJ considered test results and "again parsed the medical record," rather than addressing his "need

for significant pain medication and his multiple and various treatment modalities used to relieve

his pain, as required in SSR 16-3p."  (*Id.*)  The Court also finds these arguments without merit.

The ALJ described her consideration of Mr. Secka's treatment history, including

treatment modalities and objective findings on examination, as follows:

> [F]urther support that the claimant can perform a significant range of "sedentary" work comes from his treatment history and observations at his medical appointments. The claimant is not a surgical candidate and his treatment history through the relevant insured period has been conservative, and limited primarily to opiate prescription medication, frequent injections, and in-home therapies. An examination of his treatment history and subjective complaints during the relevant period indicate that his spinal impairment symptoms waxed and waned in response to treatments, and at no point did his symptoms rise to the level of debilitating. He evidenced no medical treatment of record from June 2007 until August 2010, shortly after he had renewed workers' compensation litigation following a reported lifting injury/re-injury on the June 1, 2010, date of alleged disability onset. The claimant has been accommodated with use of an assistive device but has frequently been observed to ambulate with a non-antalgic or tandem gait throughout the relevant period []. Furthermore, despite a display of positive straight leg tests throughout the record, the claimant underwent normal testing in December 2017 [] and consistently exhibited either 4/5 or 5/5 strength in his extremities. [] The observations of the claimant demonstrating the ability to ambulate effectively and exhibit full strength, particularly when paired to the mostly moderate findings reflected in both his diagnostic images and tests, are inconsistent with a finding that the claimant suffers from debilitating spinal impairment. However, the totality of the medical records from the relevant period do indicate that the claimant has significant limitations resulting from his physical impairments. As such, looking at the records from the relevant period as a whole, the evidence supports a finding that the claimant was capable throughout the relevant insured period of performing at least "sedentary" work with the additional accommodations and limitations ascribed above. Moreover, the undersigned notes that claimant has consistently alleged ongoing pain, unremitting since his alleged nonsurgical lifting injury in June 2010 and continuing after his agreed workers' compensation settlement in 2011 -- reflected as well in his June 2020 hearing testimony. In recognition of the concentration issues attributed to his pain, the undersigned has found that the record supports an additional nonexertional limitation to performing only simple, routine and repetitive tasks. The numerous references and equivocal evidence as to the claimant's use of and medical need for a cane are deemed sufficient to warrant the additional limitation to jobs that accommodate the use of a cane or other assistive device for ambulation or balance, and a sit/stand option.

(Tr. 752 (internal citations omitted) (emphasis added).)

Mr. Secka's argument that "the ALJ curiously and erroneously relied on a lack of evidence *before Mr. Secka's alleged disability onset date*" is not well taken.  (ECF Doc. 9 p. 18 (emphasis in original).)  SSR 16-3p explains that an ALJ "considering the intensity, persistence, and limiting effects of an individual's symptoms" is to "examine the entire case record, including the objective medical evidence . . . and any other relevant evidence in the individual's case record."  SSR 16-3p, 82 Fed Reg. 49462, 49464.  Mr. Secka did not object to the ALJ's characterization of his severe spinal impairment as "degenerative disc and joint disease of the lumbosacral spine with chronic pain, radicular symptoms, and other residual effects, *status post remote (2005) L5-S1 microdiscectomy* (post laminectomy syndrome)."  (Tr. 752 (emphasis added).)  Indeed, his own brief characterizes medical records dating back to his 2005 lumbar microdiscectomy as "Pertinent Medical Evidence."  (ECF Doc. 9, pp. 4-5.)  In that context, there was nothing curious or erroneous about the ALJ's accurate observation that the medical records in evidence do not show treatment for Mr. Secka's spinal impairment during the three years preceding his reported "injury/reinjury" on the alleged onset date.  (Tr. 752.)

The Court is also unpersuaded by Mr. Secka's argument that the ALJ "failed to address the identification of Mr. Secka's pain as refractory, the strength and increased dosages of Mr. Secka's pain medications or the frequency of the more invasive pain management regimens including injections, blocks, ablations, and rhizotomies."  (ECF Doc. 9 pp. 18-21.)  In considering Mr. Secka's treatment modalities, the ALJ observed that he "is not a surgical candidate and his treatment history through the relevant insured period has been conservative, and limited primarily to opiate prescription medication, frequent injections, and in-home therapies," and that "his spinal impairment symptoms waxed and waned in response to treatments."  (Tr. 752 (emphasis added).)  The ALJ had already noted that Mr. Secka displayed

pain behaviors at a psychiatric assessment in 2016 "for which he was being prescribed OxyContin, a powerful and highly addictive narcotic." (Tr. 747.) She observed that his "long term reliance upon multiple addictive opiate pain medications (including Opana, Percocet/oxycodone, Vicodin/hydrocodone, transdermal patches and OxyContin) may fairly considered in evaluating the reliability of his ongoing pain complaints, in terms of any unremitting severity." (Tr. 749.) She acknowledged his 2015 report of having "undergone facet radiofrequency and epidural steroid injections for his back in the past," and that he "had 'been doing well on OxyContin' regimen." (*Id.*) She acknowledged that "he 'walked with an obvious gait disturbance'" after undergoing a nerve block procedure. (*Id.*) The ALJ finally observed that Mr. Secka had "consistently alleged ongoing pain, unremitting since his alleged nonsurgical lifting injury in June 2010 and continuing after his agreed workers' compensation settlement in 2011 -- reflected as well in his June 2020 hearing testimony," and accordingly found that "the concentration issues attributed to his pain" warranted "an additional nonexertional limitation to performing only simple, routine and repetitive tasks." (Tr. 752.)

Although Mr. Secka argues that the evidence supports more restrictive limitations, he has not shown that the ALJ ignored evidence or failed to properly consider his complaints of pain in light of the record as a whole. Having reviewed the ALJ's decision and the evidence of record, the Court concludes that the ALJ's evaluation of Mr. Secka's pain complaints and resulting RFC is supported by substantial evidence. Because it is not a reviewing court's role to "try the case *de novo*, nor resolve conflicts in evidence," *Garner*, 745 F.2d at 387, this Court cannot overturn the Commissioner's decision "so long as substantial evidence … supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. For the reasons stated above, the Court finds Mr. Secka's first assignment of error to be without merit.

**C.    Second Assignment of Error: Whether ALJ Identified Jobs in Significant Numbers to Satisfy Her Burden of Proof at Step Five**

Mr. Secka argues that the ALJ failed to meet her burden of identifying jobs in "significant numbers" that could accommodate his functional limitations.  (ECF Doc. 9 pp. 21-24.)  Since the ALJ found Mr. Secka could not perform his past relevant work, "the burden shift[ed] to the Commissioner to identify a significant number of jobs in the economy that accommodate [Mr. Secka's] residual functional capacity (determined at step four) and vocational profile."  *Jones*, 336 F.3d at 474.

As explained in the Social Security Act:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2)(A).  The Act and implementing regulations further explain that "work exists in the national economy when it exists in *significant numbers either* in the region where [the claimant] live[s] *or* in several other regions of the country."  20 C.F.R. § 404.1566(a) (emphasis added); *see* 42 U.S.C. § 423(d)(2)(A).  This determination is not dependent on whether work exists in the area where the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for the job.  42 U.S.C. § 423(d)(2)(A); *see also* 20 C.F.R. § 404.1566(a)(1)-(3); *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999) ("The Commissioner is not required to show that job opportunities exist within the local area").  Nevertheless, "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where [a claimant] live[s] are not considered 'work which exists in the national economy.'"  20 C.F.R. § 404.1566(b) (emphasis added).

The term "significant number" is not defined in the Act or its regulations.  The Sixth Circuit has acknowledged that it is a "difficult task" to "enumerat[e] exactly what constitutes a 'significant number.'" *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988).  Certainly, there is no "special number which is . . .  the boundary between a 'significant number' and an insignificant number of jobs."  *Id.*  Nevertheless, the court has recognized that "Congress did not intend to foreclose a claimant from disability benefits on the basis of the existence of a few isolated jobs."  *Hall*, 837 F.2d at 275 (quoting *Walker v. Mathews,* 546 F.2d 814, 819 (9th Cir. 1976)).  Thus, the Sixth Circuit holds that the determination of whether a "significant number" of jobs exist is a case specific inquiry that is subject to a substantial evidence standard.  *Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 906 (6th Cir. 2016) (citing *Hall*, 837 F.2d at 275).

The Sixth Circuit has offered some examples of criteria that might be considered in assessing whether work exists in "significant numbers," such as: "the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on."  *Hall*, 837 F.2d at 275; *Taskila*, 819 F.3d at 906 (citing *Hall*, 837 F.2d at 275); *Harmon*, 168 F.3d at 292 (citing *Hall*, 837 F.2d at 275).  These factors are "suggestions only" and an "ALJ need not explicitly consider each factor."  *Harmon*, 168 F.3d at 292.  "The decision should ultimately be left to . . . common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Hall*, 837 F.2d at 275.

In this case, the ALJ "considered the claimant's age, level of education, work experience, residual functional capacity and the June 2020 hearing testimony of the impartial vocational expert" in concluding that Mr. Secka "remained capable throughout the relevant insured period

of making a successful adjustment to work that exists in significant numbers in the national

economy. (Tr. 755.) She based this finding in part on the testimony of the vocational expert

("VE") that the following jobs would be available to an individual with Mr. Secka's RFC:

- addresser, with an estimated 3,000 available nationwide;

- election clerk, with an estimated 6,700 available nationwide; and

- table worker, with an estimated 1,000 available nationwide.

(Tr. 803-04.) Her reliance on vocational expert testimony to identify specific jobs available in

the national economy that an individual with Mr. Secka's limitations could perform was

consistent with the law. *Wilson*, 378 F.3d at 549; *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x

462, 469 (6th Cir. 2017).

Mr. Secka does not challenge the general principle that an ALJ may rely on vocational

expert testimony to support her Step Five finding. Rather, he contends that the Court cannot find

the three jobs identified by the vocational expert in this case amount to a "significant number" of

jobs until the ALJ provides "a significantly more detailed analysis" of the *Hall* factors, given the

significant erosion of the occupational base reflected in the VE's low job numbers. (ECF Doc. 9,

pp. 22-23.) But there is nothing in the Sixth Circuit's discussion of the criteria that ALJs

"might" consider as "suggestions only" that would support a finding by this Court that such an

analysis is necessary. *See Hall*, 837 F.2d at 275; *Harmon*, 168 F.3d at 292.

Further, as the Commissioner observed, the ALJ's decision did effectively address many

of the *Hall* factors. (ECF Doc. 10, p. 11.) She addressed "the level of claimant's disability" and

"the reliability of the claimant's testimony" in her Step Four analysis of Mr. Secka's RFC. (Tr.

750-53.) She addressed "the reliability of the vocational expert's testimony" and the "types and

availability" of the jobs identified by the VE in her Step Five analysis. (Tr. 754-55.) While the

ALJ did not address "the distance claimant is capable of traveling to engage in the assigned work," the Sixth Circuit has explained that the ability to travel specific distances to work is an "individual consideration[] extrinsic to the disability itself" which "cannot enter into a finding of disability." *Harmon*, 168, F.3d at 293.  The ALJ also did not address "the isolated nature of the jobs," i.e., whether the jobs identified by the VE "exist only in very limited numbers in relatively few locations outside of the region where [plaintiff] live[s]." *Harmon*, 168 F.3d at 292 (quoting 20 C.F.R. § 404.1566(b)).  But the Commissioner correctly observes that Mr. Secka has neither argued nor pointed to evidence suggesting that any of the identified jobs are available only in isolated locations outside of the region where Mr. Secka lives.  (ECF Doc. 10, p. 11.)

A substantial evidence review of the finding that Mr. Secka is capable of performing a "significant number" of jobs requires this Court to consider: "Did the ALJ use 'such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion.'" *Taskila*, 819 F.3d at 904. Here, the ALJ appropriately relied on the VE's testimony to support her findings at Step Five.  *Fry v. Comm'r of Soc. Sec.*, 476 F. App'x 73, 76 (6th Cir. 2012) (finding that VE's testimony "satisfied the Commissioner's burden of showing that a significant number of jobs were available to [claimant]); *Wilson*, 378 F.3d at 549; *Staymate*, 681 F. App'x at 469. The VE testified to the availability of three jobs with a total of 10,700 available in the national economy.  (Tr. 803-04.)  The VE also testified that the list was not an exhaustive list.  (Tr. 809.) No objection was raised to the vocational expert offering testimony in this case (Tr. 800-01) and there is no claim that the vocational expert's testimony was unreliable.  The ALJ evaluated the vocational expert's jobs numbers testimony in light of Mr. Secka's level of disability as well as his level of education and work experience.  (Tr. 755.)

In *Taskila*, the Sixth Circuit observed that "[s]ix thousand jobs in the United States fits comfortably within what this court and others have deemed 'significant.'"  819 F.3d at 905 (citing cases).  Mr. Secka argues that the ALJ erred in finding the 10,700+ jobs identified by the VE in this case to be a "significant number" because the ALJ did not consider the factors in *Hall*.[5]  (ECF Doc. 9, p. 24.)  For the reasons set forth above, the Court finds that remand is not required for further analysis of the *Hall* factors, that the ALJ met her burden at Step Five in finding the jobs identified by the vocational expert amounted to a "significant number" of jobs, and that the ALJ's findings were supported by substantial evidence.  The Court therefore finds Mr. Secka's second assignment of error to be without merit.

## VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

September 18, 2023

/s/*Amanda M. Knapp*

AMANDA M. KNAPP
United States Magistrate Judge

---

[5] Mr. Secka also argues the ALJ did not consider the "factors" in *Mackins v. Astrue*, 655 F.Supp.2d 770 (W.D. Ky. 2009).  The court in *Mackins* did not set forth factors for consideration so much as question whether the specified jobs were consistent with the claimant's functional limitations and question the reliability of the vocational expert's testimony regarding job numbers.  *See Taskila*, 819 F.3d at 906 (citing *Mackins*, 655 F.Supp.2d at 773, 778).  Neither of those issues are before this court.